IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARRELL BELLARD, #428757

                         *

           Plaintiff,

    v.                      *   CIVIL ACTION NO. ELH-17-2115

ROBUISTIANO BARRERA, M.D.    *
MAHBOOB ASHRAF, M.D.
KRISTA DAWN SELF, R.N.P.     *
RICHARD RODERICK, *Acting Warden*

                         *

Defendants.

                         *****

## MEMORANDUM OPINION

On July 26, 2017, this 42 U.S.C. § 1983 civil rights case for declaratory and injunctive relief, as well as monetary damages, was filed by plaintiff Darrell Bellard, a self-represented inmate who was then housed at the North Branch Correctional Institution ("NBCI").[1]  ECF 1.  In his Complaint (ECF 1), lodged against several defendants, Bellard alleges that he suffers rheumatoid arthritis in both knees, resulting in pain, stiffness, tenderness, and swelling.  Further, he alleges that NBCI's Acting Warden, Richard Roderick, dismissed his Administrative Remedy Procedure ("ARP") grievance concerning his medical condition.  ECF 1 at 2, ¶ 7.[2]  And, Bellard contends that Robustiano Barrera, M.D., the Medical Director for the Western Maryland regional prisons, had actual knowledge of his condition and bears responsibility for his inadequate medical care.  ECF 1 at 1, ¶ 4.  In addition, Bellard claims that Dr. Barrera, Dr. Mahboob Ashraf,

---

[1] Bellard is currently housed at Western Correctional Institution.  The date of his transfer from NBCI is not apparent in the record.

[2] Citations in this Memorandum Opinion correspond to the pagination assigned through the Court's electronic docketing system.

and Registered Nurse Practitioner Krista Dawn Self (collectively, "the Medical Defendants") have failed to provide appropriate medical care. *Id.* at 1-2, ¶¶ 5-6.

In a preliminary injunction request accompanying the Complaint (ECF 3), Bellard alleged that he would suffer irreparable harm if not provided adequate pain medication, a medical cell, and assistive devices (a walking cane for his cell and unit and a wheelchair for all travel outside his cell). In a court Order dated July 28, 2017 (ECF 4), counsel for the Maryland Attorney General was directed, *inter alia*, to respond to plaintiff's claim of a medical emergency. The Maryland Attorney General responded to Bellard's medical concerns in ECF 13. Thereafter, this court denied plaintiff's request for preliminary injunction (ECF 20; ECF 21) and later denied (ECF 32) Bellard's requests for reconsideration of that decision (ECF 23; ECF 26), despite Bellard's claim that he is without his cane and remains without medication.

Bellard seeks unspecified compensatory and punitive damages. He also seeks injunctive relief mandating renewal of his Ultram prescription, placement in a medical cell, and unfettered use of a cane and wheelchair. ECF 1 at 7.

The Medical Defendants have filed a motion to dismiss or, in the alternative, motion for summary judgment. ECF 14. It is supported by a memorandum of law (ECF 14-4) (collectively, the "Motion") and several exhibits, including plaintiff's extensive medical records. *See* ECF 14-5. Bellard opposes the Motion (ECF 16), supported by exhibits. And, Bellard submitted additional filings at ECF 17; ECF 18. Additionally, Bellard subsequently submitted affidavits in support of his opposition. ECF 22; ECF 25; ECF 27. The Medical Defendants have replied. ECF 19.

Acting Warden Richard Roderick, the sole correctional defendant, was not served with a copy of the Complaint. Although the Office of the Maryland Attorney General responded to the

show cause order and provided Bellard's medical record, it has filed no response to Bellard's allegation that Roderick denied Bellard's Administrative Remedy Procedure grievance concerning his ongoing medical issues. A copy of the ARP grievance was not included with Bellard's Complaint, nor is it found elsewhere in the record.[3]

No hearing is necessary to determine the matters pending before the court. *See* Local Rule 105.6 (D. Md. 2016). For reasons noted herein, Defendant Roderick shall be DISMISSED and summary judgment shall be GRANTED in favor of Medical Defendants Barrera, Ashraf, and Self.

## II. Standard of Review

The Medical Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 12. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the

---

[3] Had Roderick responded, he would be entitled to dismissal. Denial of an ARP request, without more, does not state a cognizable constitutional claim. *See Rogers v. United States,* 696 F.Supp. 472, 488 (W. D. Pa. 2010) (if grievance official's only involvement is investigating/ruling on prisoner grievance after incident has already occurred, no personal involvement found under § 1983) (citing *Rode, et al. v. Dellarciprete, et al.,* 845 F.2d 1195, 1208 (3rd Cir. 1988)). In any event, for the reasons stated herein, Bellard's Eighth Amendment claim against the Medical Defendants fails, thus obviating any claim for damages against the Warden based on the denial of Bellard's grievance against medical personnel.

motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries*,

*Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *Putney v. Likin*, 656 F. App'x 632, 638-640 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). A party "needs an 'adequate opportunity' to present its case and 'demonstrate a genuine issue of material fact.'" *Adams Housing, LLC v. City of Salisbury, Maryland*, 672 Fed. App'x 220, 222 (4th Cir. 2016) (per curiam) (citation omitted). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (hereinafter, "*Harrods*") (quoting *Evans v. Tech's. Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, [he] cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing the affidavit requirement of former Rule 56(f)). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll*., 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because

"'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961); *see also Dave & Buster's, Inc.*, 616 F. App'x at 561. But, the nonmoving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961). The failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary," when the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit,'" and if the nonmoving party "was not lax in pursuing discovery." *Harrods*, 302 F.3d at 244-45 (citation omitted).

Bellard requested limited discovery, seeking affidavit or video evidence to support defense contentions that he walks without a cane, used his cane as a weapon, and was seen playing basketball. ECF 17 at 1-2. He also asked for independent medical and mental health examinations, which he claims are necessary for proper determination of this case. *Id.* at 2.

In the Memorandum denying injunctive relief, this court stated that defendants may not rely on mere assertions concerning Bellard's ability to walk without assistance and to play sports, without support in the record, and granted them 21 days to provide the court with video or affidavit evidence in support of these statements. ECF 32. The Medical Defendants have since indicated that they have no video evidence or direct affidavit evidence from individuals who

actually saw Bellard walk and/or play sports. ECF 33 at 1, ¶ 2. They also note that the video, alluded to at ECF 14-5 at 111, no longer exists. *Id.* ¶ 3.

Nevertheless, given the extensive medical record that has been produced, exceeding 200 pages (ECF 14-5), the Court shall deny further discovery in this case. Moreover, I am satisfied that it is appropriate to address the Medical Defendants' Motion as a motion for summary judgment, as this will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.,* 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh,* 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 313 (4th Cir. 2013).

In sum, to counter a motion for summary judgment, there must be a genuine dispute as to material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the

moving party demonstrates entitlement to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).

### III. Factual Background

A.     Bellard's Allegations

Bellard claims that the Medical Defendants have failed to treat his "stage III, severe, or stage IV, Terminal Rheumatoid Arthritis" in both knees. ECF 1 at 2, ¶ 10. Further, he contends that following his transfer from Western Correctional Institution ("WCI") to NBCI on April 7, 2016, he has been denied proper medication; denied a handicap-equipped cell; and was refused ambulatory assistive devices, including a wheelchair and cane, which was taken from him on February 14, 2017. ECF 1 at 2-3. Bellard states that after his cane was taken away, he was unable to move about NBCI, and thus he could not participate in scheduled physical therapy ("PT") sessions. *Id.* at 3.

Bellard also complains that he has difficulty walking to the medical unit for sick call, and was unable to keep an appointment on July 10, 2017. *Id.* at 5. He asserts that following x-rays taken at WCI on May 25, 2017, WCI medical personnel recommended his use of a wheelchair, but NBCI medical staff ignored that recommendation. Instead, he is allowed wheelchair use only when he attends PT. *Id.* at 4-5. Moreover, plaintiff complains that Defendant Self "cancelled" his Ultram prescription in April 2016, instead substituting Cymbalta, a medication Bellard states is ineffective in controlling his pain. *Id.* at 6.

Bellard provided affidavits (ECF 22; ECF 25) stating that he has been without a cane since February 14, 2017, and must walk to the cafeteria for meals and to the medical unit. Because he has no cane, he avers that he is starving and unable to obtain his medication. *Id.* Similar averments have been filed in affidavits from prisoners housed on Bellard's tier, or

familiar with his circumstances, including Today Cooper, Jerrod Webster, Melvin Holloway (ECF 22-1 through ECF 22-3), as well as Ernest Cleveland, Gary Smith, Eric Poole, William Spencer, Donald Stromann, and Jean Germain.  ECF 27-1 through ECF 27-5.

       B.     The Medical Defendants' Response

An understanding of Bellard's ongoing joint pain issues is provided by a review of his medical records, compiled during his previous housing assignment at WCI.

Bellard, who is in his early fifties, suffers from a number of health conditions.  Most relevant here are his diagnoses of arthropathy (arthritis) of the lower legs with joint pain, bilateral moderate degenerative joint disease of the knees, bilateral hip pain, and back pain.  ECF 14-6 (Affidavit of Ava Joubert, M.D.), ¶ 4.

On January 2, 2016, while Bellard was housed at WCI, his prescription for Tramadol, an opioid pain medication, was discontinued because it causes dependence and is not an anti-inflammatory drug indicated for osteoarthritis (degenerative joint disease).  ECF 14-5 at 6.  Four days later, on January 6, 2016, Bellard was involved in an altercation with a fellow prisoner and treated for a stab wound to the hand and exposure to pepper spray.  The medical record notes that Bellard, whose wound was stitched and who remained in the infirmary until January 8, 2016, reported he broke his cane over the back of his assailant.  Bellard "ambulated to the infirmary with no difficulty."  *Id.* at 12.  His cane was taken the following date by correctional staff, who indicated it had been taken "as evidence."  *Id.* at 21.  Bellard complained of weakness in both legs and indicated he used the cane for distance only.  *Id.* at 22.  At the time of discharge,

Bellard's use of Tylenol #3 with codeine was discontinued. *Id.* at 30. He was prescribed indomethacin[4] for arthritis. *Id.* at 28.

On January 17, 2016, Bellard complained to WCI medical personnel of knee and hip pain. *Id.* at 36. He stated that Mobic[5] was ineffective to control his pain. Registered Nurse Practitioner Krista Self (Bilak) saw Bellard at WCI on February 3, 2016. She prescribed a four-month prescription for Ultram ("Tramadol"). *Id.* at 42.

Bellard was involved in another altercation on March 7, 2016. This resulted in injury to his left hand. *Id.* at 47.

On March 27, 2016, Bellard, still housed at WCI, complained that he needed his cane due to knee soreness and to prevent a fall. *Id.* at 51. He was transferred to NBCI on April 13, 2016. *Id.* at 55, 58.

Bellard was seen by Registered Nurse Dawn Hawk on April 18, 2016, and requested a refill of Baclofen.[6] Hawk's notes indicate Bellard used a cane and had a steady gait. *Id.* at 62-63. He was referred to a mid-level medical provider for his prescription needs and further assessment. ECF 14-5 at 62-63.

On April 23, 2016, Bellard was scheduled for an assessment concerning the continuing need for a cane, a medical cell, and bottom bunk status. Notes indicate he did not attend the

---

[4] Indomethacin is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs), which work by reducing hormones that cause inflammation and pain. It is used to treat chronic arthritis and other skeletal conditions. *See* http://www.drugs.com/ search.php?searchterm indomethacin

[5] Mobic (meloxicam) is another NSAID used to control arthritis inflammation. *See* https://www.webmd.com/drugs/2/drug-18173/mobic-oral/details

[6] Baclofen is a muscle relaxer and an antispastic agent used to treat muscle spasm, pain and stiffness. *See* http://www.drugs.com/baclofen.html

medical assessment.  *Id.* at 64.  Two days later, on April 25, 2016, Bellard met with Dr. Ashraf regarding his pain medications.  Ultram was continued until June 3, 2016, and Indomethacin, Mobic, and Baclofen were continued until July 25 2016.  *Id.* at 65-66.

Despite these medications, on May 16, 2016, Bellard complained of chronic pain in his knees and hip.  *Id.* at 67.  He requested a bottom bunk, cane, and placement in a medical cell. According to Bellard, he had received these accommodations while at WCI.  *Id.* at 68.

On May 25, 2016, Bellard told Registered Nurse Laura Dorman that he had prior surgeries to his knees and that there was "no cartlidge (sic) left in his knees."  *Id.* at 72.  He complained that his Ultram dose was decreased.  *Id.*  On June 4, 2016, he requested renewal of his expired pain medication.  *Id.* at 73.

Plaintiff was seen by Dr. Ashraf on June 17, 2016, who approved a bottom bunk assignment for one year based on plaintiff's medical history.  *Id.* at 74.  Although Bellard did not complain about his knees, Dr. Ashraf issued new prescriptions for Indomethacin and Baclofen for Bellard's chronic pain.  *Id.*

Bellard submitted a sick call slip on June 20, 2016, requesting to see a provider about his medications.  *Id.* at. 79.  On June 22, 2016, Registered Nurse Ricki Moyer noted Bellard was in no distress but walked with his cane.  *Id.* at 80.  Bellard requested Tramadol and was told his request would be discussed with a mid-level provider.  *Id.*

On July 20, 2016, Bellard again complained he had no medication and was experiencing serious pain in his knees.  *Id.* at 81.  On July 22, 2016, Registered Nurse Amy Booth saw Bellard and contacted a mid-level provider for same day treatment orders.  *Id.* at 82.  Bellard was told to continue his current medication plan, which included Baclofen and Indomethacin, and that Tramadol was not indicated.  He was also advised to apply hot and

cold compresses to his knees, as needed, and to submit a sick call slip for further evaluation if his condition changed. ECF 14-5 at 82.

Bellard did not complain further regarding his joint pain until October 17, 2016, when he reported back spasms and joint pain and sought renewal of his prescriptions. *Id.* at 86. On October 19, 2016, Nurse Practitioner Self renewed Bellard's Baclofen and Indomethacin prescriptions. *Id.* at 87-88. On December 2, 2016, Plaintiff submitted a sick call slip complaining of pain and swelling in both knees and difficulty in walking. *Id.* at 90. Nurse Moyer saw plaintiff on December 4, 2016, and noted the swelling. *Id.* at 91-92. He was told to elevate his knees and to continue his medication, and that he would be referred to a mid-level provider for further evaluation. *Id.* Bellard refused to attend the scheduled mid-level visit on December 12, 2016, and signed a release of responsibility. *Id.* at 93.

Bellard was seen by Registered Nurse Beeman on January 17,2017, for complaints of left hip and bilateral knee pain. *Id.* at 97-99. Bellard admitted he had not been taking Indomethacin, which he found ineffective, and requested stronger medication. *Id.* On exam, crepitus in both knees was noted. Bellard, who used a cane to attend the visit, was told he would be referred to a mid-level provider. *Id.*

On February 13, 2017, Registered Nurse Practitioner Self recommended Bellard receive physical therapy to determine whether there was a medical reason to continue his cane order. *Id.* at 105. The next day, February 14, 2017, Self noted that Bellard "was observed and recorded ambulating on the compound and in the day room without cane. Cane will be discontinued." *Id.* at 106.[7] Within several hours, Registered Nurse Breauna L. Baker was called to the recreation

---

[7] Medical personnel reference a video taken on February 12, 2017, which is alleged to show Bellard using his cane while ambulating, but foregoing use of the cane to move short distances. *Id.* at 111. The video no longer exists. ECF 33 at 1, ¶ 3. The lack of a video does not

area because Bellard, who was seated on the ground, stated he was unable to stand up without the cane. ECF 14-5 at 107. Bellard was in no distress and able to move all extremities, and was advised to avoid any gym or courtyard activity for one week. An order for bed rest was issued by Dr. Ashraf by telephone. *Id.* at 107-108.

Nurse Moyer was called to evaluate Bellard in his cell on February 16, 2017, after an incident involving used of force, and found Bellard sitting on the floor and stating he could not get up without his cane. ECF 14-5 at 110. A notation several hours later states that "per custody, [patient] ambulating in cell, no [signs] of acute distress." *Id.*

Plaintiff began physical therapy on February 23, 2017. *Id.* at 111. Physical Therapist Stephen Ryan noted Bellard, who was obese, was brought to his appointment in a wheelchair but could stand with moderate assistance and could balance while standing. Bellard's range of motion was normal in the right lower extremity, as were his left hip and knee. Bellard had some limitation in passive range of motion in the left knee with mild swelling. *Id.* Bellard was noted to ambulate functionally with his cane, and was assessed with osteoarthritis of the left knee. Ryan recommended a physical therapy plan that would involve strengthening the knees and gait training to restore functional active range of motion to the left knee, promote independent ambulation without any assistive device, and establish a self-management plan. *Id.* Bellard attended physical therapy on February 25 and 28, 2017, but failed to attend his remaining PT sessions. *Id.* at 113-114, 120, 125-126.

On April 17, 2017, Bellard submitted a sick call slip reporting that he attempted to walk to physical therapy, to no avail, and his knee was swollen. *Id.* at 116. He refused to be

taint the validity of medical notes, which indicate that Bellard relied on a cane to move about the prison, but at times could forego use of the cane to walk limited distances. This finding bears no impact on the underlying Eighth Amendment aspects of this case, *i.e.*, whether Bellard's medical care, including medications, was sufficient to address his arthritis and orthopedic pain.

seen by health care personnel that day unless provided a wheelchair, which was not deemed medically necessary. ECF 14-5 at 116, 118-119.

Bellard did not attend his scheduled PT session with Physical Therapist Lloyd Hoyt on April 18, 2017. *Id.* at 120. On April 20, 2017, he was rescheduled for sick call evaluation, but again refused to walk to sick call for his appointment with Dr. Ashraf. *Id.* at 121. Bellard also failed to attend a scheduled PT session with Hoyt for the same day. *Id.* at 124. This refusal to attend PT continued on April 25 and 27, 2017. *Id.* at 125.

On May 18, 2017, Bellard complained he was out of pain medication, that he had no cartilage in his knees, and that he used a chair to maneuver around his cell and to get to the recreation hall and the shower. *Id.* at 128. He requested renewal of his bottom bunk assignment and medical assignments for a medical cell and cane, plus assignment for a wheelchair or cane so he could reach the medical unit. *Id.* The following day, May 19, 2017, Registered Nurse Stacie Mast noted that Bellard had severe difficulty walking to his appointment, and was unable to support his weight or sit on the exam table. *Id.* at 129-130. According to Mast, Bellard explained that his cane was removed after he was seen playing basketball in the yard. *Id.* Mast referred Bellard to a mid-level provider. *Id.*

Nurse Self examined Bellard on May 25, 2017. He reported worsening pain in his knees without his cane, indicating that pain in his left knee was worse than his right. *Id.* at 132-133. Bellard moved slowly with frequent stops, could climb on and off the exam table, and had crepitus bilaterally in the knees, without swelling. Nurse Self ordered x-rays of the knees and recommended Bellard return to physical therapy, placing a wheelchair order to shuttle plaintiff back and forth to each session. *Id.* Self also prescribed Mobic to address Bellard's chronic pain complaints. *Id.* at 131-132.

An order for a bottom bunk for plaintiff was reissued on June 4, 2017. ECF 14-5 at 140. X-rays on June 5, 2017, revealed moderate degenerative joint disease in the knees with osteophytes and reduced joint space. *Id.* at 142. On June 12, 2017, Nurse Self informed Bellard of the x-ray results and started him on Cymbalta, a chronic pain medication.[8]

Bellard reported to PT Ryan on June 22, 2017, that he had trouble walking due to bone spurs in the knees. *Id.* at 150. He walked with a limp. Although the right knee was within normal limits as to active range of motion, Ryan noted the need to rule out spurring of the joint in the left knee, but questioned whether Bellard magnified his symptoms. *Id.* Ryan prescribed quad strengthening exercises and exercises to stabilize Bellard's gait, in order to address his ability to walk functional distances in the facility independently. *Id.*

On June 23, 2017, Bellard asked Self to broaden his wheelchair order for all trips outside his housing unit and renewed his request for return of his cane. *Id.* at 151. In response, Bellard was seen by Nurse Hawk. *Id.* at 152-153. Hawk noted that Bellard could get on and off the exam table without difficulty and had a slow but steady gait. Self noted others had reported Bellard walked normally inside the dayroom and during recreation, where he was observed playing basketball. *Id.*

Bellard was a "no show" for PT on June 27, 2017. *Id.* at 154. During his PT session on July 3, 2017, Bellard reported a pain level of 7 out of 10 in his knee, but was able to tolerate therapy. *Id.* at 155. The level of pain and therapy tolerance continued during PT sessions held July 5 and July 7, 2017. *Id.* at 156-157. Bellard refused therapy on July 11, 2017, due to severe pain. *Id.* at 158. On July 29, 2017, Bellard told PT Ryan that he was slightly better. Ryan

---

[8] Cymbalta (duloxetine) is used to treat major depressive and general anxiety disorders, as well as fibromyalgia (a chronic pain disorder), chronic muscle or joint pain (such as low back pain and osteoarthritis pain), and pain caused by diabetic neuropathy. *See* https://ww\v.drugs.com/cymbalta.html

found no swelling or redness. Bellard's active range of motion in the left lower leg was within normal limits, and was normal in the right hip and ankle, although some limitation in the right knee was present. ECF 14-5 at 161. The plan was to continue physical therapy for six sessions. *Id.*

Bellard was brought to the medical unit on August 7, 2017, claiming he could not stand on his left leg. *Id.* at 162-163. Registered Nurse Robin Shively found swelling in the knee with tenderness and referred Bellard to a physician. *Id.* That same day, Dr. Ashraf examined Bellard and ordered an x-ray of the left knee and hip. Mild joint effusion[9] was seen in the left knee. *Id.* at 164. But, the x-ray showed no evidence of acute injury or abnormality. *Id.* at 166.

Bellard was admitted to the infirmary for observation and bed rest, and given Toradol every 12 hours for pain.[10] Mobic and Baclofen were also prescribed. *Id.* at 168-169. During Bellard's admission, he managed to push his bed by himself across the room, in order to be closer to the toilet, although he previously reported that he could not walk. *Id.* at 171.

On August 8, 2017, Dr. Ashraf reviewed the results of the x- rays with Bellard, and explained to him that physical therapy was needed for rehabilitation to address his bilateral leg weakness. *Id.* at 172-173. Bellard was seen hobbling on one leg to and from the bathroom. *Id.*

---

[9] Joint effusion implies abnormal accumulation of a fluid inside the synovial space due to numerous conditions, including trauma, infections, both systemic and joint-related diseases, and tumors. Limited mobility of the affected joint and pain are the two most important complaints, and treatment depends on the underlying cause. *See* https://www.symptoma.com/enlinfo/joint-effusion

[10] Toradol (ketorolac) is a NSAID that reduces hormones that cause inflammation and pain in the body. It is used short-term (5 days or less) to treat moderate to severe pain, usually after surgery. *See* http://www.drugs.com/toradol.html

Bellard was seen by Nurse Practitioner Janette Clark on August 9, 2017, complaining of pain in the bottom of his left foot shooting up his thigh into the buttock. Bellard claimed he got no relief from the pain with his medication. ECF 14-5 at 180. Toradol was discontinued and a Medrol dose pack was prescribed.[11] *Id.* Bellard was advised to perform his PT exercises and stretch while in bed. He continued to ambulate using one leg. *Id.*

On August 10, 2017, Bellard told Nurse Self the pain continued, and requested a walker or wheelchair. *Id.* at 185. A walker was provided. *Id.* at 187. The following day, August 11, 2017, Bellard told Dr. Ashraf his current medication regimen helped with pain. *Id.* at 190. Examination was unremarkable, and Bellard was informed by Ashraf that he had been approved for additional physical therapy. *Id.*

On August 12, 2017, the infirmary night nurse saw Bellard walking to the bathroom without difficulty. *Id.* at 193. On the morning of August 12, 2017, he was evaluated by Certified Registered Nurse Practitioner Holly Pierce, and told that he would be discharged that day on his current pain medication to resume physical therapy and a home exercise regimen. *Id.* at 194-195. Bellard was discharged and returned to his unit via wheelchair. *Id.* at 198.

Bellard refused to attend his physical therapy session on August 14, 2017, claiming that he could not walk. *Id.* at 201. Bellard notified medical personnel that he was to receive crutches to move around his housing unit. *Id.* at 197. Notes indicate, however, that discharge orders did not include an order for crutches. *Id.* at 202-203.

---

[11] Methylprednisolone, a steroid that prevents the release of substances in the body that cause inflammation, is used to treat many different inflammatory conditions such as arthritis, lupus, psoriasis, ulcerative colitis, allergic disorders, and gland (endocrine) disorders. *See* https://l/www.drugs.com/mtm/medrol-dosepak.html

Bellard was called to medical on September 1 1 , 2017, so that blood work could be drawn to test h i m for inflammatory diseases, such as rheumatoid arthritis. He refused the blood draw. ECF 14-6 (Joubert Affidavit), ¶ 43.

Dr. Joubert opines that Bellard suffers chronic joint pain affecting his hips and knees due to arthritis of unknown origin and has not, contrary to his claim, been diagnosed with "stage III or IV terminal rheumatoid arthritis." *Id.* ¶ 42. In her opinion, his moderate degenerative joint disease is likely caused by the normal aging process, and has been appropriately managed with opioid pain medications, NSAIDS, and physical therapy. *Id.,* ¶¶ 42, 44.

### III. Discussion

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, ___ U.S. ___, 135 S. Ct. 1983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the

Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of

constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). It protects the rights of postconviction detainees. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor*, 817 F.3d at 127.

For a plaintiff to prevail in an Eighth Amendment suit as to the denial of adequate medical care, the defendant's action or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has

characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, ___ F. App'x ___, 2018 WL 3120790, at *7 (4th Cir. June 25, 2018) (emphasis in *Formica*).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38).

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must

also show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

The subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "it is not enough that the defendant *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*). The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

Yet, the Supreme Court concluded in *Farmer* that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844. The Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]" *Id.* at 845 (citations and quotation marks omitted). Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard. *Id.*; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not);

*Stritehoff v. Green*, CCB-09-3003, 2010 WL 4941990, at *3 (D. Md. Nov. 30, 2010) ("An officer who responds reasonably to 'the risk of which he actually knew' is not liable for deliberate indifference.") (quoting *Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001)).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied,* 529 U.S. 1067 (2000), is also pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate inference claim requires more than a showing of "mere negligence"); *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A

plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011). And, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

The Court does not doubt that Bellard has chronic pain and mobility issues related to arthritis. But, the record unequivocally shows that the Medical Defendants have not been deliberately indifferent to a serious medical need. To the contrary, they have attempted to manage Bellard's condition conservatively, using medication and physical therapy, and have

determined that continual opioid medication and reliance on a wheelchair are not warranted. Moreover, there was concern about Bellard's use of a cane as a weapon.

The Medical Defendants have based their diagnoses on x-rays but have not precluded further testing to rule out, for example, rheumatoid arthritis as the cause of Bellard's condition. For his part, Bellard has not been entirely compliant in regard to attempts to strengthen his lower extremities, and he refused to allow testing and blood work to determine the true nature and cause of his arthritis. Until a full diagnosis is obtained, a proper treatment protocol, above and beyond the conservative treatment already prescribed, cannot be determined.

## IV. Conclusion

The Medical Defendants have provided constitutionally adequate medical care with regard to Bellard's chronic pain, and summary judgment in their favor is appropriate. A separate Order follows.


Date:   August 9, 2018                    _____/s/_____
                                          Ellen L. Hollander
                                          United States District Judge